Patrick Curtis HAVARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 69581.

Court of Criminal Appeals of Texas,
En Banc.

June 14, 1989.
Rehearing Granted Sept. 13, 1989.
On Rehearing Sept. 19, 1990.
Rehearing Overruled Nov. 28, 1990.

William F. Carter, Madisonville, for appellant.

Frank Blazek, Dist. Atty., Huntsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(1). After finding the appellant guilty, the jury returned affirmative answers to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.

The appellant was convicted of knowingly and intentionally causing the death of Kevin Williams, a peace officer who was acting in the lawful discharge of an official duty. Appellant raises thirty-one points of error. We will affirm.

On March 9, 1985, appellant went to the home of his estranged wife, Linda Havard, and her roommate, Lynn Risner. Appellant arrived at their apartment in the Woodcreek complex at approximately 1:15 A.M. According to the testimony of Lynn Risner, appellant and his wife argued, and the argument escalated into a scuffle. When Risner became concerned for Linda Havard's safety, she called the police. Officer Kevin Williams responded to the call for the Huntsville Police Department. Jay Huber and David Hall, security guards for Resources Unlimited, were also dispatched to the scene by their employer because Resources Unlimited had a security contract with the management of the Woodcreek Apartments.

Hall arrived first on the scene, riding a Resources Unlimited motorcycle. About a minute later, Officer Williams arrived in a marked Huntsville Police car, immediately followed by Huber in a Resources Unlimited station wagon. Williams pulled into a parking place as did Huber and Hall.

Hall testified that, as he was propping his helmet on the motorcycle, he heard Lynn Risner yelling for help and saw her running towards them. After Risner came around the corner of a building, Linda Havard approached from an alley running between two buildings. At this point, the testimony begins to conflict.

According to Risner's testimony, she saw appellant step from behind a building, raise a .22 caliber rifle to his shoulder, and point it at the police officer. She said that she shouted "There he is," and pointed in appellant's direction. Officer Williams then turned to appellant and shouted "Freeze; stop; police; drop your weapon." She said that she saw a flash from the muzzle of appellant's rifle and heard a shot. Risner counted six shots, all fired by appellant, but was not able to say precisely where the shots were aimed. On cross-examination, she was able to add few details.

Hall's and Huber's testimony was substantially the same as Risner's. The only direct conflict was that both security guards agreed that Risner did not shout "There he is" and that Officer Williams did order appellant to freeze and drop his weapon, but did not announce that he was a police officer. In addition, Hall said that after the shots were fired, appellant went back around the building beside which he had been standing. Hall drew his pistol and followed appellant. He saw appellant start to get into a pickup truck. Hall shouted for appellant to freeze and drop his weapon, and appellant complied.

Next, Huber arrived at the scene and asked Hall if appellant was the man who had fired the shots. Appellant replied to Huber, "Yeah, I did it." Huber's testimony corroborated that of Hall. Huber's testimony supplied the additional information that he was struck in the shoulder by appellant's fifth shot. All three of these witnesses testified that the area was well-lit and that everyone at the scene was visible.

Medical testimony showed that Williams was killed by a small caliber gunshot wound to the middle of the forehead and

also had a through-and-through wound to the shoulder. The fatal bullet was of a similar type as that found in the gun that appellant fired, but the deteriorated condition of the bullet prevented a positive ballistics match.

Appellant's testimony agreed with that of Huber and Hall, with certain additions. Appellant testified to his agitated mental state at the time of the offense; that he believed that he saw a flash from Williams' gun, that he believed was fired at him; and that he did not know that Williams was a police officer. Neutron activation tests and the testimony of Risner, Hall, and Huber indicate that appellant was the only one to fire a gun.

■ In his twenty second point of error, appellant argues that the trial judge erred in denying his motion for a directed verdict at the end of the State's case in chief. The uncontroverted evidence showed that appellant intentionally or knowingly fired the fatal shot at Officer Williams and that, at the time of the killing, Williams was a peace officer engaged in the exercise of his official duties. The only contested factual issues, in regard to this motion, was whether appellant was aware that Williams was a peace officer. Our examination of the sufficiency of the evidence will, thus, be limited to this element of the offense.[1]

The standard for review applicable to a motion for directed verdict is the same as that used in reviewing the sufficiency of the evidence. This Court has recently set out that standard in *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989).

> [T]he test as delineated in *Jackson [v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)] requires us, as the reviewing court, to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

We must take each case and review the entire body of evidence to determine whether the State has proven beyond a reasonable doubt each and every element of the alleged crime and not just a plausible explanation of the crime.

*Butler*, supra at 239.

Hall, Huber, and Risner all testified that, although his overhead lights were not flashing, Williams arrived in a conspicuously marked police car and was wearing a Huntsville Police Department uniform and badge. Their testimony, as well as that of other police officers and EMS technicians who arrived on the scene after the shooting, indicated that the parking lot was amply illuminated. State's exhibits 11, 16, 30, 31, 32, 33, and 34, color photographs of the scene taken the night of the shooting, indicate that visibility was good. Although appellant elicited the fact that some of the photographs were taken with the aid of a flash device, other photographs were not so assisted. Finally, appellant was able to see well enough to fire a shot that struck Williams "right between the eyes." Based on this evidence, a rational trier of fact could have easily believed that the State had proven, beyond a reasonable doubt, that appellant was on notice that Williams was a peace officer. Appellant's twenty-second point of error is overruled.

■ In his first point of error, appellant complains of the trial court's denial of his motion for change of venue. Appellant's motion was timely filed, stated a cognizable reason for change of venue, and was properly accompanied by affidavits in support of his motion. The State controverted appellant's motion in a timely manner, raising a factual issue and the need for a hearing.

At the evidentiary hearing on this motion, appellant called two representatives of the local news media. Kathy Bear, of the *Huntsville Item*, testified concerning the coverage of this case by her newspaper. She stated that only the initial reports concerned the facts of the crime and appellant's possible involvement. Although she

---

**1.** In his brief, appellant also limits this point of error to a discussion of the evidence in support of this element.

conceded that this story was one of the two most heavily covered in her two years on the paper, she characterized most of the articles and letters published as having to do with Officer Williams, personally, and efforts to raise money to aid the family. She stated that these later, and predominant articles, contained no discussion of appellant. She concluded, as far as media coverage of the event was concerned, that appellant could receive a fair trial in Walker County.

J.D. Dickenson, of a local radio station, testified similarly to Ms. Bear. His testimony agreed with Bear's characterization of the news coverage, and he also believed that appellant could receive a fair trial in the county.

Dean Lewis, a local banker, testified concerning his personal efforts to raise money to aid Officer Williams' family. He concluded that appellant could receive a fair trial and recalled that a significant number of the people who approached a fund-raising booth at a local fair did not know who Officer Williams was.

Other witnesses for appellant testified that it would be difficult, but not impossible, to find 12 unbiased jurors and stated that they would prefer to be tried outside Walker County. Ken Lee, one of appellant's compurgators, stated that he did not believe that appellant could receive a fair trial, but he admitted that he had not formed an opinion as to appellant's guilt.

The State's witnesses all believed that appellant could receive a fair trial. These witnesses included the owner of a local cafe, two county commissioners, the warden for the Walls unit of T.D.C., and two local, civil attorneys.

In reviewing the motions for change of venue, where there is a hearing on the motion and conflicting testimony is adduced, the proper standard of appellate review is whether the trial judge abused his discretion in denying the motion. E.g., *Cockrum v. State*, 758 S.W.2d 577, 584 (Tex.Cr.App.1988). Here, the vast majority of the testimony indicated that appellant could receive a fair trial. Based on the strength of the evidence indicating that appellant could receive a fair trial and the specific exhibits of newspaper reports and radio broadcasts, the trial judge did not abuse his discretion. Appellant's first point of error is overruled.

In his second point of error, appellant argues that the trial judge erred in excusing venireman Thomas Mims for cause. During the State's initial voir dire of Mr. Mims, he said that he would be unable to answer "yes" to the special issues, regardless of what the evidence showed, because of his personal opposition to the death penalty. The State challenged Mr. Mims for cause. During cross examination, Mims vacillated, stating that "I would probably vote 'yes' if that was my conviction as far as the evidence goes." After further examination by the State, Mr. Mims stated that he would definitely have to answer the special issues "no." At this point, the State reasserted its challenge. Appellant's attorney, in a final attempt to get Mr. Mims to equivocate, conducted the following examination:

Q: You just told me, Mr. Mims, that if you were on this jury even though you're against the death penalty that if the State proved to you beyond a reasonable doubt each one of these three elements, proved to you that there should be a "yes [sic] answer and you believed that, and you take an oath as a juror that even though you're against the death penalty, if the evidence so warrants it, are you telling this Court now that even though you believed a "yes" answer should be to number one, and number two, and number three that you would go against what you believed the evidence was and just automatically vote "no" simply because you were against the death penalty?

A: Yes, sir.

Q: So you have changed what you told me the first time?

A: (No audible response.)

Q: And can you conceive of a set of circumstances where you would vote "yes" in one, two and three?

A: (No audible response.)

Q: You can conceive of no crime no matter how horrible where you would be able to vote "yes" for one, two and three?

A: No.

Q: No set of circumstances in your wildest imagination?

A: (No audible response.)

MR. BLAZEK [Prosecutor]: Judge, may the record reflect he's shaking his head "no" to the question?

MR. MIMS: No.

MR. BLAZEK: Once again we would renew our challenge at this time.

MR. LAKE [Defense attorney]: Judge, we're going to object to excusing him.

THE COURT: Very well, your objection is noted and he is excused.

MR. LAKE: I think we're close to the line. He said he would violate his oath for his conscience, but is strongly, you know—

THE COURT: Of course, that why's [sic] he's here. He's trying to tell us how he feels.

MR. LAKE: I understand and I appreciate it.

THE COURT: I appreciate your objection and it is noted, but it's overruled.

MR. CARTER [Defense attorney]: Judge, further on this objection to explain our objection a little more, we feel like that he has not unequivocally stated his belief. He seems to have equivocated between probably and maybe; yes, I could; no I couldn't, and we think under Witherspoon that if there is any idea of equivocation that he cannot be excluded.

THE COURT: Is that an unequivocal no, Mr. Mims, that you could never vote "yes" regardless of the evidence?

MR. MIMS: I could never vote—Yes.

THE COURT: That's an unequivocal no.

MR. LAKE: It means, of course, that you would violate your oath in order to honor your conscience; is that right?

MR. MIMS: Uh-huh.

THE COURT: He nods "yes". All right, you are excused sir.

In a capital murder case, if a potential juror is, because of conscientious scruples against the death penalty, unable or unwilling to follow the law in answering the special issues, he may be excused for cause on motion by either party. E.g., *Bennett v. State,* 742 S.W.2d 664, 674 (Tex.Cr.App. 1987); *McCoy v. State,* 713 S.W.2d 940, 952–53 (Tex.Cr.App.1986).

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that in order for a juror to be subject to a challenge for cause based upon that juror's views on the death penalty, the record must show that the juror's views would prevent or substantially impair the performance of his or her duties in accordance with the oath taken and the trial judge's instructions. The Supreme Court also indicated that reviewing courts were to give due deference to the trial court's decision given its position to gauge the juror's sincerity and demeanor. *Bennett,* supra at 674. Characterizing Mr. Mims as an "equivocating" juror, appellant asserts that *Wainwright v. Witt,* supra, prevents his excusal for cause. While Mr. Mims did vacillate in his answers, he ultimately stated that he could not answer the issues "yes." The voir dire examination of Mr. Mims was remarkably similar to that of venireman Griggs in *Perillo v. State,* 758 S.W.2d 567, 575–76 (Tex.Cr.App.1988).[2] As in *Perillo,* supra, we find that Mr. Mims definitively stated that he could not follow the law and was properly excused. *Perillo,* supra; *McCoy,* supra. Appellant's second point of error is overruled.

■ In his third point of error, appellant argues that the trial judge erred in excusing venireperson Karen Glaze because of

---

**2.** In *Perillo,* supra, the venireman continued to vacillate until the judge declared a recess for lunch and told Mrs. Griggs to take that time to consider her views of the death penalty. When the proceedings resumed after lunch, Mrs.

Griggs stated definitively that she could not answer "yes" to the special issues. We do not find this period of reflection to be a meaningful factual distinction.

her opposition to the death penalty. During the State's initial examination of Ms. Glaze, she stated that she had always been opposed to the death penalty and could not sentence a defendant to death. After an explanation of the procedures set out in Art. 37.071 V.A.C.C.P., she agreed that she would answer one of the special issues "no," regardless of the evidence, in order to avoid a death sentence. Appellant attempted to rehabilitate the venireman.

[Questions by Mr. Carter]

Q: Now, I know you're against the death penalty, but if they have proved that [the special issues should be answered "yes"] to you, would you automatically go against what they have proved to you and find "no" for number two because you would think by answering "yes" he would get the death penalty, if they had proved it to you beyond a reasonable doubt?

A: That's a hard question. If they prove it to me, I might look at it different. I don't know right now.

Q: Okay. So what you're saying is you could consider a set of circumstances where you could give the death penalty, couldn't you, if they've proved it to you?

A: I really don't know. I'm sure, like I say, if they proved it to me right now, I don't believe in it, and it goes further and they prove it and—I really have to think about it. That's all I can say. I just really have to think about it. This has been bothering me for a while.

On redirect examination, the State elicited the following:

[Questions by Mr. Blazek]

Q: Can you imagine any set of facts or circumstances that the State of Texas could prove to you that would change your mind about that and that you would feel right now that if we had proved it to you, you could vote for the death penalty and vote "yes" to those three special issues and have the death penalty result by your verdict?

A: Right now you're saying?

Q: That's where we are. We're right now. That's were we are; we're right now.

A: I don't think so. I just don't believe in it. That's all I can say. I just don't believe in it.

Q: When you say you don't believe in it, you mean the death penalty?

A: The death penalty.

Q: And you don't believe you can invoke the death penalty by your vote, do you?

A: I don't believe in the death penalty.

MR. BLAZEK: Judge, I think—

THE COURT: Well, the question is how would she answer the question if she were convinced.

BY MR. BLAZEK:

Q: And knowing your belief about the death penalty, would you always answer at least one of the special issues "no" in order to avoid the death penalty?

A: I would. If I know to answer these "yes" I would probably put "no" on one of them just to avoid the death penalty.

Q: Regardless of the facts and circumstances you would answer one of them "no" to avoid the death penalty?

A: Right now that's the way I feel.

THE COURT: All right, any further questions?

BY MR. LAKE:

Q: Your answer was right now, and your answer to that means that I would probably put "no." Is that your answer?

A: Yes, if that's, you know, if that means that if I didn't put "no" on either one of them and it means that he is sentenced to death—I mean sentenced to life—I mean the death penalty, I would probably will [sic].

As stated in the above discussion of the second point of error, a venireman who would be unable to follow the law may be properly excused for cause. *Perillo,* supra.

In determining whether a venireman may be disqualified under *Wainwright v. Witt,*

supra, we must examine the entire testimony of that venireman. Here, the closest that Ms. Glaze ever came to indicating that she *could* answer the special issues according to the law was in her statement, "That's a hard question. If they prove it to me, I might look at it different. I don't know right now." Given the context of the entire voir dire, this statement could probably be paraphrased "At some point in the future, I might be able to be persuaded to answer all three special issues 'yes.'" Glaze's final statements on this subject, however, reveal that presently she would be unable to follow the law and answer the special issues in strict accordance with the evidence presented.

Our reading of the cold record, accompanied with the trial judge's opportunity to observe the venireman's demeanor leads us to the conclusion that Ms. Glaze could not follow the law and was properly dismissed for cause. Appellant's third point of error is overruled.

■ In his fourth point of error, appellant argues that testimony concerning his attempted escape from the Walker County jail prior to trial should not have been admitted. Appellant argues that under *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App. 1972), and *Clark v. State*, 726 S.W.2d 120 (Tex.Cr.App.1986), evidence having greater prejudicial than probative value should not be admitted. While appellant is correct in stating the relevant rule, we have repeatedly held that evidence of escape or attempted escape from pretrial detention has greater probative than prejudicial value. E.g., *Rumbaugh v. State*, 629 S.W.2d 747, 752 (Tex.Cr.App.1982); *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Cr.App.1979).

> [T]o support admission of evidence of escape from custody and flight, it must appear that the escape and flight has some legal relevance to the offense under prosecution.... In order to have such evidence excluded, the burden then shifts to the defendant to show affirma-

tively that the escape and flight is directly connected to some other transaction and further show that it is not connected with the offense on trial.

*Rumbaugh*, supra at 752 (quoting *Wockenfuss v. State*, 521 S.W.2d 630, 632 (Tex.Cr. App.1975)). Here, appellant fails to make any attempt to connect his escape attempt to another offense, and the record is devoid of any evidence that appellant was being held pursuant to other charges. Appellant's fourth point of error is overruled.

■ In his fifth point of error, appellant argues that photographs of his jail cell which show that an escape was attempted were erroneously introduced into evidence. Based on *Burdine v. State*, 719 S.W.2d 309 (Tex.Cr.App.1986), and *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972), appellant acknowledges that photographs are admissible if the equivalent oral testimony would be admissible. For the reasons stated in the immediately preceding point of error, the challenged photographs were admissible. Appellant's fifth point of error is overruled.

■ In his sixth point of error, appellant argues that the trial judge should have declared a mistrial due to prosecutorial misconduct when the prosecutor disobeyed an order not to display certain photographs to the jury. The State sought to have a number of photographs admitted into evidence, but the trial judge refused to admit them.[3] During direct examination of a forensic pathologist, the prosecutor displayed the photographs to the witness and asked him to describe what they depicted. Appellant objected to this procedure, and the objection was overruled. Appellant asked for a hearing outside the presence of the jury. At this hearing, appellant argued that the prosecutor was inflaming the minds of the jurors by letting them know that there were photographs too gruesome for them to view. The judge agreed and instructed the prosecutor to cease this tactic. When appellant asked for a mistrial,

---

**3.** The pictures apparently depicted Kevin Williams' body on a mortuary slab, both before and after certain autopsy procedures were performed. These pictures were not included in the record with the exhibits that were admitted. Our account of the subject of the photographs is gleaned from counsels' arguments as recorded in the statement of facts.

the judge denied the motion. The prosecutor did not repeat the actions which prompted appellant's objection, and all parties agree that the jury never saw the content of the photographs.

Appellant bases this point of error on language from Justice Clark's opinion in *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081, 1092 (1961), which condemns governmental lawlessness in the judicial process, and *Dakin v. State*, 632 S.W.2d 864 (Tex.App.—Dallas 1982). The State responds that the prosecutor never violated any order by the trial judge. We agree with the State's assessment.

The judge's first order, not to exhibit the photographs to the jury, was obeyed. Appellant has conceded in his brief that the jury never saw the photographs. The second order, requiring that the prosecutor cease using the photographs during examination of his witness, was also obeyed. Because this point of error is premised on the allegation that the prosecutor violated one of the judge's orders, we find in it no merit. Point of error six is overruled.

■ In his seventh point of error, appellant argues that the trial judge erred in overruling his motion for a mistrial based on the State's failure to provide him, pursuant to a pretrial discovery motion, with exculpatory evidence. In part, the motion asked for:

> (3) All oral, written and recorded statements.... made by the Defendant to any investigating officer or to an member of any law enforcement agency or to any third party and in the possession of or within the knowledge of the District Attorney's office or any agent therefore, including any law enforcement agency.
>
> \* \* \* \* \* \*
>
> (23) All evidence which might tend in any manner to exculpate the Defendant on the issue of guilt or innocence or which might be favorable to the Defendant upon such issue.
>
> (24) All evidence which might tend in any manner to mitigate the punishment of the accused for the offense with which he is charged.

These discovery requests were granted by the trial judge.

During the guilt/innocence phase of trial, the State called Lt. Frank Hidalgo to testify. In preparation for his cross-examination, appellant was given an offense report prepared by Lt. Hidalgo. After cross-examination, appellant made an oral motion for mistrial based on the State's failure to comply with the discovery order. The offense report revealed that appellant had made a statement to the sheriff of Walker County and a jail administrator. The report indicated that appellant told the authorities that he fired at Officer Williams after Williams fired at him.

Appellant argues that the State's failure to produce this statement violated the discovery order and, thus, denied him his right to due process. Appellant cites *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as setting out the proper standard for reviewing this point of error. We disagree. *Agurs*, *Moore*, and *Brady* all involved the nondisclosure of exculpatory evidence known to the state, but not to the defendant.

In *Agurs*, the Supreme Court stated:

> The rule of *Brady v. Maryland* arguably applies in three quite different situations. Each involves the discovery, after trial of information which had been known to the prosecution but *unknown to the defense.*

*Agurs*, supra, 427 U.S. at 103, 96 S.Ct. at 2397 (citation omitted and emphasis added). Here, appellant knew of the fact that he made a statement to the police and the content of that statement. First, appellant knew of both the existence and the content of his statement, as a matter of simple logic, because he was there when it was made. Second, at a pretrial hearing on change of venue, appellant's exhibit number 13 was the script for a broadcast on a local radio station. The exhibit reads, in relevant part:

HAVARD WAS TAKEN TO THE WALKER COUNTY JAIL WHERE HE REFUSED TO TALK TO OFFICERS, AND EVEN REFUSED TO GIVE THEM HIS NAME. HAVARD REPORTEDLY STATED THAT HE WOULD ONLY TALK WITH SHERIFF DARRELL WHITE. HAVARD DID REVEAL HIS NAME TO JUSTICE OF THE PEACE LLOYD ROARK, WHO WARNED HAVARD OF HIS CONSTITUNIONAL [sic] RIGHTS. HAVARD THEN TALKED TO THE SHERIFF AND TOLD HIM THAT HE AND HIS WIFE ARE SEPARATED AND THAT HE WENT TO THE APARTMENT TO TALK TO HER ABOUT THEIR INCOME TAX. HE SAID THAT WHEN HE ASKED AN OCCUPANT OF THE APARTMENT TO LET HIM SPEAK TO HIS WIFE, HIS WIFE CAME TO THE DOOR WITH THE RIFLE AND HE TOOK THE GUN AWAY FROM HER. HAVARD TOLD THE SHERIFF THAT THE OFFICERS ARRIVED AND PULLED THEIR WEAPONS AND ORDERED HIM TO DROP THE GUN, AND HE SAID THAT HE LOWERED THE WEAPON THEN TIPPED IT UP AND STARTED SHOOTING. HAVARD SAID THAT HE STARTED SHOOTING WHEN THE OFFICERS SHOT AT HIM, BUT, IT HAS BEEN DETERMINED THAT NONE OF THE OFFICERS EVER FIRED THEIR WEAPONS.

Thus, this exhibit gave appellant notice, prior to trial, that he had made a statement to the Sheriff and the content of that statement. Appellant's written motion contains no citation to any legal authority, and his brief before this Court is limited to a discussion of *Brady,* supra, and its progeny. *Brady, Moore,* and *Agurs* simply do not apply to this factual setting. Appellant's seventh point of error is overruled.

▆▆▆▆ In his eighth point of error, appellant argues that it was reversible error for the trial judge to admit, over objection, a photograph of Officer Williams and his daughter. Appellant argues that the photograph had no relevance and would tend to inflame the jury. An objection to photographic evidence is waived if the same information contained in the photographs is conveyed to the jury in some other form. *Brown v. State,* 696 S.W.2d 913, 914 (Tex. Cr.App.1985); cf. *James v. State,* 772 S.W.2d 84, 98 (Tex.Cr.App.1989).

In *Brown,* supra, the defendant was tried for attempting to murder Ruiz. Oville, a person who tried to stop the altercation between the defendant and Ruiz, was also stabbed by the defendant. The defendant objected to the introduction of photographs which depicted the injuries received by Oville. The basis for the defendant's objection was that these photographs constituted proof of an extraneous offense. We found that the objection was waived because Oville showed his wounds in open court and told about the circumstances surrounding their infliction. Thus, the information which the defendant wished to keep from the jury, the existence of an extraneous offense, found its way to the jury through an alternate route, and for that reason, error was waived.

Here, appellant sought to exclude the photograph because it informed the jury that appellant had a child and depicted that child's appearance. Prior to admission of the photograph, one of the State's witnesses, Officer Horner, identified Officer Williams' wife, children, and parents sitting in the first row of the courtroom. Appellant did not object to this identification. Because the family had been identified, the jury had the opportunity to view the family and observe the girl depicted in the photograph. In this way, the jury was exposed, without objection, to the same information that served as the basis for appellant's objection to the photograph.[4] Appellant's eighth point of error is overruled.

---

4. The discussion that took place at the time of appellant's objection to the photograph reveals that appellant objected to the inclusion of

**206**

[[ ]]*

■ In his twelfth, thirteenth, and fourteenth points of error, appellant complains of the trial judge's refusal to include the following proposed instruction in the jurys charge:

You are further instructed that the term "committed deliberately" as it appears in the charge is defined as the commission of an act with premeditation, design, scheme, and calculation, and further, that the commission of the act must not be the result of any sudden passion or impulse which would render the mind of the actor incapable of cool reflection.

In his twenty-ninth point of error he argues that the failure to provide a statutory definition for "committed deliberately" prevents the jury from fully considering mitigating evidence.[5] We will discuss points of error twelve, thirteen, fourteen, and twenty-nine jointly.

Noting *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977), appellant acknowledges that it is a matter of settled law in this state that the charge to the jury need not define the term "committed deliberately." See also, e.g., *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex.Cr.App.1986). Because this phrase has not been statutorily defined, the jury charge need not define "committed deliberately," and until such time as the legislature elects to provide a definition, we will not require trial judges to include a definition in jury charges. *James*, supra at 102 n. 17. Appellant's twelfth, thirteenth, fourteenth, and twenty-ninth points of error are overruled.

■ In his fifteenth and sixteenth points of error, appellant complains of the trial judge's refusal to include the following instruction in the jury charge at the punishment phase.

You are further instructed that in answering Special Issue No. 3 that you can consider not only the provocation, if any, of the deceased, but also the provocation, if any, of the person or persons, if any, acting with the deceased.

In point of error fifteen, appellant characterizes the third special issue as "imperfect self-defense" and seeks to have us apply the requirement that, if raised by the evidence, the jury must be instructed that self-defense applies to all assailants, not only the deceased. Point of error sixteen argues that, if the third special issue is limited only to the conduct of the deceased, the jury is prevented from considering all mitigating evidence.[6] Appellant groups these two points of error, and we will decide them together.

Although a capital murder defendant has a right to have all evidence considered in mitigation of punishment, he is not entitled to jury instructions specifically informing the jury that specific evidence may be considered or how it may be applied. E.g., *James*, supra at 102; *Cordova v. State*, 733 S.W.2d 175, 190 (Tex.Cr.App.1987) *cert. denied* 487 U.S. 1240, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988); *Demouchette*, supra at 80.

Appellant was entitled to present evidence of any mitigating circumstances and did present such evidence.... The question then is whether the language of the special issue is so complex that an explanatory charge is necessary to keep the jury from disregarding the evidence

---

Williams' daughter in the photograph and *not* to the depiction of Williams, himself.

* The discussion of the appellant's ninth point of error was withdrawn on rehearing. See opinion on Appellant's motion for rehearing, *infra*, p. 213. The square double brackets indicate deleted material.

5. Arguably, any definition of "committed deliberately" would restrict, rather than expand, the jury's consideration of mitigating evidence. By limiting the meaning of that phrase, the scope of evidence which would be relevant to the question would be similarly limited.

6. Appellant argues that the wording of Art. 37.-071(b)(3) V.A.C.C.P. (third special issue), limits consideration of evidence of provocation to provocation by the deceased, eliminating any consideration of provocation by other parties. Appellant is only partly correct. While, on its face, the third special issue prevents the jury from relying on third-party provocation, the entire scheme of Art. 37.071 does allow consideration of such evidence. If appellant's actions were in response to provocation, this would necessarily bear on the jury's determination of future dangerousness.

properly before it. In *King v. State,* 553 S.W.2d 105 (Tex.Cr.App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978), this Court held that the questions in Art. 37.071 used terms of common understanding which required no special definition. The jury can readily grasp the logical relevance of mitigating evidence to the [special] issue[s]. . . .

*Quinones v. State,* 592 S.W.2d 933, 947 (Tex.Cr.App.1980), cert. denied, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121, rehg. denied, 449 U.S. 1027, 101 S.Ct. 600, 66 L.Ed.2d 490 (1980). Thus, because the meaning of each of the special issues is readily understandable and because the evidence which appellant considers to be mitigating was heard by the jury, no additional instruction was required. Appellant's fifteenth and sixteenth points of error are overruled.

■ In his twenty-fourth and twenty-fifth points of error, appellant argues that the trial court erred by overruling his objection to the charge at punishment because it failed to include an instruction concerning voluntary intoxication as mitigating evidence.

As we held in points of error fifteen and sixteen, regardless of the evidence which would support such an instruction, there is no need to include specific instructions apprising the jury of what mitigating evidence may be considered and how the jury might want to use it. *James,* supra; *Cordova,* supra; *Demouchette,* supra; *Quinones,* supra. Appellant's twenty-fourth and twenty-fifth points of error are overruled.

■ In his thirtieth and thirty-first points of error, appellant argues that Art. 37.071, supra, failed to allow consideration of all mitigating evidence in this case. The State responds that appellant's challenge to our sentencing scheme was resolved against him in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

In *Franklin,* supra, the United States Supreme Court concluded that the trial court's refusal to give petitioner's requested special instructions did not violate his Eighth Amendment right to present mitigating evidence. *On the facts of that case,* a majority of the Court found that the jury was able to fully consider all mitigating evidence.

As in *Franklin,* we find that the mitigating evidence in the instant case could be fully considered within the framework of the three special issues. The only mitigating evidence to which appellant cites in his brief is voluntary intoxication and the idea of third-party provocation. Voluntary intoxication clearly serves to suggest that appellant's violent acts were the product of a temporary state, rather than a more permanent psychosis or general defect in character. As such, the jury could have used this evidence to answer "no" as to the question of future dangerousness.

Second, as explained earlier, supra n. 7, third-party provocation is indicative of a dynamic cause of appellant's behavior, rather than some static condition. Again, such evidence could have been used by the jury to find that appellant would not pose a future threat of violence. Because all of the mitigating evidence before the jury was cognizable under the special issues, appellant was not denied his Eighth Amendment right to present mitigating evidence. See generally, *Franklin,* supra. Points of error thirty and thirty-one are overruled.

In his seventeenth through twenty-first points of error, appellant raises a number of issues related to the manner in which the jury returned its verdict during the punishment phase of trial. We will first discuss the facts, which are common to all five points of error, and then examine the points of error, grouping the points when common issues of law predominate and discussing them separately when appropriate.

The charge at punishment included the following instruction:

If there is any Special Issue on which the vote of the jurors is not unanimously "Yes" or not at least ten (10) in favor of an answer of "No," then there shall be no answer for that Special Issue and the Presiding Juror should not sign his or

her name to any answer form for that Special Issue.

At 11:35 A.M., the jury retired to deliberate on punishment. At 1:15 P.M., the jury sent the following note to the trial judge:

Dear Judge Ernst,

do you need the ballots on all issues, or only the Charge?

/s/ B.J. Dees [Foreman]

The judge replied with a note stating, "I don't understand the question."

At 2:10, the jury indicated that they had reached a verdict and returned to the courtroom. The following transpired immediately upon the verdict form being passed to the judge:

THE COURT: Let's see here. All right, now let's see. I see no answer—to Special Issue No. 1, I see no answer. To Special Issue No. 2, I see no answer. To Special Issue No. 3—

MR. BLAZEK: Judge, I think we're going to have to have a discussion outside the presence of the jury as to what to do at this point.

THE COURT: By virtue of the form of this verdict, if you will, do me a favor and go back to your jury room and let me talk to these lawyers and get back with you folks.

(The jury was then excused from the courtroom with the following being heard outside their presence.)

THE COURT: They only answered one issue.

MR. BLAZEK: They need to answer all three.

THE COURT: I want everybody to understand. What has happened is, they have answered only one issue, yes. The other two issues have not been answered. Ya'll look at it and let's see what our approach should be at this point.

MR. BLAZEK: Well, Judge, I think the law is clear. That's what they call a non-verdict, and I ask that they be instructed to return until they reach a verdict.

THE COURT: I agree, but let's be sure everybody understands where we're going. And until a verdict is

received, it's not a verdict, and it has not been received. See, they have not answered 1 and 2, and the Court will not receive a verdict until it's complete, so I may just return them to work and suggest that they respond to all three questions.

MR. LAKE: Now, Judge, I think we're going to move for a mistrial.

THE COURT: All right, get formal here now. All right, you're on the record.

MR. LAKE: All right, let's have this on the record then.

MOTION FOR MISTRIAL

By MR. LAKE

Comes now the defendant in the above numbered cause and moves for a mistrial for the following reasons, to wit:

The jury has returned a verdict that is incomplete. It is signed on the Special Issue No. 3 only, and signed by the presiding juror in provided for his signature, and on Special Issue No. 3. Special Issue No. 1 and Special Issue No. 2 are unanswered. We move for a mistrial on the grounds that the verdict is not complete.

THE COURT: Very well, the Court will deny the Motion for mistrial and the Court will not receive the verdict. The Court will ask the jury to continue their deliberations. Bring them in. (The jury was then summoned back into the courtroom with the following being heard.)

THE COURT: All right, folks, let's see. We have technically an incomplete verdict, so I'm going to ask you to go back and respond to the Charge as suggested, and when all the questions have been answered, if you're able to answer all the questions, then the verdict can be returned into Court. You may continue you deliberations.

At 2:25 P.M., the jury again retired to deliberate.

While the jury was out, appellant read the following motion into the record:

MOTION TO RECEIVE VERDICT

BY MR. CARTER:

Now comes the defendant, Patrick Curtis Havard, in the above entitled and numbered cause, and moves this Honorable Court to receive the verdict of the jury which was returned at 2:10 P.M. on October 10, 1985. The defendant would respectfully show unto the Court the following:

That the verdict as received by the Court was signed by the Jury Foreman on the last page; that Special Issue No. 3 was signed, yes; that there was no answer to Special Issue No. 2; that there was no answer to Special Issue No. 1; that the Charge specifically instructed the jury that if there is any special issue on which the vote of the jury is not unanimously yes, or at least ten in favor of the answer of no, there shall be no answer for that special issue and the presiding juror should not sign his or her name to any answer form to that special issue.

The defendant specifically would urge to the Court under Article 37.071 of the Code of Criminal Procedure, Part E, if the jury returns a negative finding on or, is unable to answer any issues submitted under this article, the Court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

The defendant moves the Court to receive the verdict as was presented to it at 2:10 P.M. on October 10, 1985, because Special Issue No. 1 was not answered; Special Issue No. 2, not answered; Special Issue 3 was answered yes, and the verdict was signed by presiding juror, Mr. B.J. Dees. The defendant states that the verdict is complete and complies with Article 30.-071 [sic] of the Texas Code of Criminal Procedure, and requests that the Court receive the verdict as was turned over to it by the Jury Foreman at 2:10 P.M.

on October 10th, be received by the Court.

The State stipulated to appellant's version of the facts, and argued that there had been nothing to indicate that the jury could not reach a verdict.

At 2:40 the jury sent a note asking "If either answer on one issue cannot be reached what do we do?" The judge, over appellant's objection, instructed the jury: "Please continue your deliberations." After an undisclosed amount of time, the jury returned with a verdict. This time, all three special issues were answered affirmatively. A polling of the jurors confirmed the answers on the verdict form.

■ Appellant's seventeenth point of error argues that the trial judge abused his discretion by refusing to accept the jury's verdict of 2:10. Point of error eighteen argues that the trial judge abused his discretion by instructing the jury to continue its deliberation. And, point of error nineteen argues that the trial judge erred in overruling appellant's motion to receive the verdict of 2:10.[7] Appellant rests his argument on Art. 37.071(e) V.A.C.C.P. Subsection (e) provides that:

If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or *is unable to answer any issue submitted* under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life. [emphasis added]

Appellant reasons that, because the jury was instructed that it should leave blank any special issues on which there was neither a unanimous "yes" nor ten votes for "no," that the jury's failure to answer the first two issues indicates that they were "unable to answer" these issues, within the meaning of Art. 37.071(e). The State responds that failure to complete the verdict form does not prove that the jury was *unable* to reach a legally sufficient consen-

---

**7.** Appellant groups these three points of error in his brief. Because all of these points rely on the same analysis, we will consider them jointly.

sus, and that the trial judge properly exercised his discretion by instructing the jury to continue its deliberations.

The instruction concerning failure of the jury to reach a legal consensus on the special issues does not mean that the jury's failure to reach answers on the first two special issues was indicative of inability to answer those questions.

First, the instruction speaks of a failure to garner a unanimous "yes" or ten votes for "no." Such a failure to reach a verdict is different than an inability to reach a verdict. If the two ideas were equivalent, then a jury's failure to reach a verdict on its first ballot would mean that the jury was deadlocked, and all further deliberation would be futile. This is not the case. Juries that have difficulties in reaching a verdict may be instructed to continue deliberations. E.g., *Beltran v. State,* 728 S.W.2d 382, 392 (Tex.Cr.App.1987).

Second, Art. 36.31 V.A.C.C.P. places the determination of when a jury is deadlocked in the hands of the judge, not the jury.

It is within the trial court's sound discretion whether to discharge a jury that says it is deadlocked or to instruct it to continue deliberations. Art. 36.31 V.A.C.C.P. The standard a trial judge should use in making such a decision is whether the jury "has been kept together for such time as to render it altogether improbable that it can agree." *Id.* Neither of these rules were affected by the 1981 amendment to Art. 37.071(e). See *DeLuna v. State,* 711 S.W.2d 44, 48 (Tex.Cr.App.1986). Thus, the remaining question is whether the trial court abused its discretion in believing that the jury had not deliberated for so long that it was "altogether improbable that it [could] agree."

According to the statement of facts, the jury began deliberating at 11:35 A.M. and returned its "verdict" at 2:10. The jury resumed deliberations at 2:25, sent the second note to the judge at 2:40, and finished deliberating approximately forty-five minutes later.

Including breaks during the exchange of notes and in-court argument by counsel, the jury deliberated for approximately four hours. We hold that, given the relatively brief period of deliberation, the trial judge did not abuse his discretion by implicitly finding that a jury consensus was not "altogether improbable." Cf. *Beltran,* supra; *DeLuna,* supra; *Andrade v. State,* 700 S.W.2d 585 (Tex.Cr.App.1985); *Williams v. State,* 476 S.W.2d 300 (Tex.Cr.App.1972). Appellant's seventeenth point of error is overruled.

■■■ In his twentieth point of error, appellant argues that the trial judge violated Art. 37.071 V.A.C.C.P. when he refused to accept the "verdict" at 2:10. Point of error twenty-one argues that the trial judge erred in holding that the 2:10 "verdict" was incomplete.[8] Art. 37.071 defines a verdict as "a written declaration by a jury of its decision of the issue submitted to it in the case." Appellant argues that the jury's 2:10 "verdict" was not informal, within the meaning of Art. 37.10 V.A.C.C.P., because it comported with the court's instructions as an indication of inability to answer the first two special issues.

As discussed above, the determination of when a consensus verdict becomes "altogether improbable" lies solely within the trial judge's discretion. *DeLuna,* supra. Thus, even if the jury's failure to answer the first two special issues accurately reflected their belief that they could not reach an answer on the first two special issues, such a "finding" by the jury is not binding on the trial judge. Art. 37.071(e); see also discussion of points of error seventeen through nineteen. Because it is immaterial whether the 2:10 "verdict" accurately reflected the jury's stance concerning continued deliberation, points of error twenty and twenty-one are overruled.

■■■ In his twenty-eighth point of error, appellant argues that the trial judge's instructions to the jury to continue deliberating after the 2:10 "verdict" was returned, violated his right against double jeopardy as guaranteed by the Fifth Amendment,

---

**8.** Appellant groups these points of error.

Article I, sec. 10 of the Texas Constitution, Art. 1.10 V.A.C.C.P., and Art. 1.11 V.A.C.C.P. Appellant reasons that the 2:10 "verdict" represented a finding of "no" on special issues one and two. As such, he argues that further jeopardy on these issues was constitutionally and statutorily barred. The State relies on its arguments for points of error seventeen through twenty-one.

We must agree with the State that the previous points of error resolve this issue. As we held above, the 2:10 "verdict" did not compel the trial judge to enter a sentence of life imprisonment. In addition, a failure to reach an answer on a special issue does not bar relitigation of that issue. See *Padgett v. State*, 717 S.W.2d 55, 58 (Tex.Cr.App.1986) (in context of collateral estoppel). Point of error twenty eight is overruled.

In his twenty-sixth point of error, appellant complains of a comment made by the trial judge after the jury returned the 2:10 "verdict". Appellant argues that the trial judge's instruction for the jury to continue deliberations was an impermissible comment on the weight of the evidence. The allegedly erroneous statement was:

> All right, folks, let's see. We have technically an incomplete verdict, so I am going to ask you to go back and respond to the Charge as suggested, and when all of the questions have been answered, if you are able to answer all of the questions, then the verdict can be returned into court. You may continue your deliberations.

■■■■ Appellant correctly states that a trial judge may make no comment to the jury which would convey to the jury the judge's view of the strength of the evidence. Appellant contends that this statement to the jury conveyed the judge's view on the weight of the evidence. The State responds that, in order to preserve such error for appellate review, a defendant must object to the judge's comment and ask for an instruction to disregard. The State argues that appellant failed to do this.

A defendant, if he is to complain of error on appeal, must make a specific, timely objection. E.g., *Zillender*, 557 S.W.2d 515, at 517. Even if a proper objection is made, the defendant may not, on appeal, argue a reason for error that was not urged at trial. *Id.* Here, appellant never argued at trial that the trial judge's statement constituted an impermissible comment on the weight of the evidence. Error, if any, was waived, and appellant's twenty-sixth point of error is overruled.

In his twenty-seventh point of error, appellant argues that the complained-of comment in point of error twenty-six also constituted a misstatement of the law. Appellant's argument is premised on the assumption that the 2:10 "verdict" was complete, and the trial judge was bound to accept it. This underlying premise has already been rejected in other points of error. For the reasons stated therein, appellant's twenty-seventh point of error is overruled.

■■■■ In his twenty-third point of error, appellant argues that the evidence was insufficient to support the jury's affirmative answer to the first special issue. Art. 37.-071(b)(1) V.A.C.C.P. Appellant cites to a number of cases in which this Court has reviewed the sufficiency of evidence on the first special issue. He argues that the evidence in this case is less than in those cases, and emphasizes the mitigating effect of the evidence that Officer Williams fired at appellant. The State responds that the evidence was sufficient because it showed that when Officer Williams arrived, appellant told Risner to leave, tried to drag his wife back into the apartment, and got Risner's gun. In addition, appellant was seen aiming the rifle and was told "Freeze; stop; police; drop your weapon," before firing. We additionally find that appellant aimed the rifle using a scope; the fatal shot struck Officer Williams in the middle of the forehead; and that six shots were fired.

The standard for sufficiency of the evidence to support an affirmative finding on special issue one is whether a rational trier of fact could find beyond a reasonable doubt that the defendant acted with the reasonable expectation that death would result. E.g., *Santana v. State*, 714 S.W.2d

1, 6 (Tex.Cr.App.1986); *Goodman v. State,* 701 S.W.2d 850, 866 (Tex.Cr.App.1985). An act need not be premeditated to be deliberate, and the killing may occur during a "frenzy." *Granviel v. State,* 552 S.W.2d 107, 122–23 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). The single fact that appellant aimed at Officer Williams with a telescopic sight and struck the deceased "right between the eyes" is adequate proof that appellant had a reasonable expectation that death would result. The factors argued by the State provide additional support for our finding the evidence sufficient.

Appellant's argument concerning evidence of provocation carries no weight in this analysis. The State controverted appellant's assertion that the deceased fired his gun through use of eyewitness testimony and physical evidence. Because we must judge the evidence in the light most favorable to the verdict, we may assume that the jury did not believe appellant's account of events. See *Goodman,* supra at 866. Appellant's twenty-third point of error is overruled.

 In his tenth and eleventh points of error, appellant argues, respectively, that the trial judge erred in refusing appellant's motion for directed verdict on the second special issue and that the evidence was insufficient to sustain the jury's affirmative answer to that special issue. Appellant argues that because: he had no criminal conviction; his criminal conduct occurred when he was either a juvenile or 19 years old; he is now only 23; was in a highly agitated state when the offense was committed; and the offense was spontaneous rather than calculated, the jury reached the wrong result on future dangerousness. The State concedes that appellant has no criminal convictions, but argues that appellant has an extensive history of violent acts and has a bad reputation in the community. In addition, psychological testimony suggested that appellant has a tendency to react violently when under stress or the influence of alcohol.

In answering the special issues in a capital case, the jury may consider all evidence adduced at both phases of the trial. E.g., *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987); *Santana,* supra at 8.

The jury is permitted to consider many factors when determining whether the defendant will pose a continuing threat of violence to society. Those factors include, but are not limited to:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence; and

8. character evidence.

*Keeton,* supra at 61; see also cases cited therein.

Here, the State proved a number of violent, unadjudicated acts on the part of appellant. Such acts of violence are relevant to the second special issue, even if no criminal proceedings resulted from the acts. *Smith v. State,* 676 S.W.2d 379, 390 (Tex. Cr.App.1984), cert. denied, 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 490 (1985).

At age 19, appellant assaulted Ronnie Johnson with a rifle. Appellant beat Johnson to the point of requiring hospitalization. That same year, appellant shot Lynn Babbs. As a juvenile, appellant resisted arrest and attacked the arresting officer. Testimony revealed that appellant had bragged about this incident. All of these events suggest a pattern of violent behavior and could reasonably have contributed to the jury's affirmative answer on the second special issue.

Reputation evidence is relevant on the issue of future dangerousness. *Rougeau*

*v. State*, 738 S.W.2d 651, 668 (Tex.Cr.App. 1987); *Keeton*, supra at 61. Character witnesses testified that appellant had a bad reputation for being a peaceable, law-abiding citizen.

Psychiatric testimony is relevant to the issue of future dangerousness. *Keeton*, supra at 61. Here, appellant called Jim Whitley, a psychologist, as an expert witness. He testified that when appellant consumes alcohol, he "becomes very aggressive" and has "a complete failure of his inhibitions." In addition, when under stress, appellant has a tendency to "act out aggressively." These factors militate in favor of the jury's answer.

In reviewing the sufficiency of evidence to support an affirmative answer to the second special issue, this Court must view the evidence in the light most favorable to the verdict to determine whether "a rational trier of fact could have found the elements of Art. 37.071(b)(2), supra, beyond a reasonable doubt." *Keeton*, supra at 61. In light of our above discussion, we find that a rational trier of fact could have answered the second special issue affirmatively. Appellant's tenth and eleventh points of error are overruled.

The judgment of the trial court is affirmed.

CLINTON, J., adhering to views expressed in his dissenting opinions in *James v. State*, supra, and *Stewart v. State*, 686 S.W.2d 118, at 125–126 (Tex.Cr.App.1984), and disagreeing with treatment of points 17–21 and 11, respectfully dissents.

TEAGUE, J., dissents on point of error # 23.

DUNCAN, J., not participating.

## ON MOTION FOR REHEARING

MILLER, Judge.

Appellant was convicted of capital murder and assessed the death penalty as pun-ishment. On direct appeal, this Court found no merit in appellant's thirty-one points of error and affirmed his conviction. See *Havard v. State*, 800 S.W.2d 195 (Tex. Cr.App.1989). Appellant raises ten grounds for rehearing in his motion, of which we granted nine. Finding merit in appellant's first three grounds for rehearing, we accordingly reverse his conviction.[1] Art. 44.29(c), V.A.C.C.P.

The facts of this offense are critical to resolving the issues raised in this motion for rehearing. Appellant was convicted of killing Kevin Williams, a peace officer who was acting in the lawful discharge of an official duty. We quote the pertinent portions of the facts which were summarized in the opinion on original submission.

On March 9, 1985, appellant went to the home of his estranged wife, Linda (sic) Havard, and her roommate, Lynn Risner. appellant arrived at their apartment in the Woodcreek complex at approximately 1:15 A.M. According to the testimony of Lynn Risner, appellant and his wife argued, and the argument escalated into a scuffle. When Risner became concerned for Linda (sic) Havard's safety, she called the police. Officer Kevin Williams responded to the call for the Huntsville Police Department. Jay Huber and David Hall, security guards for Resources Unlimited, were also dispatched to the scene by their employer because Resources Unlimited had a security contract with the management of the Woodcreek Apartments.

Hall arrived first on the scene, riding a Resources Unlimited motorcycle. About a minute later, Officer Williams arrived in a marked Huntsville Police car, immediately followed by Huber in a Resources Unlimited station wagon. Williams pulled into a parking place as did Huber and Hall.

Hall testified that, as he was propping his helmet on the motorcycle, he heard Lynn Risner yelling for help and saw her

---

1. We do not address the merits of the remaining six grounds, numbers four through nine, since we find merit in appellant's first three grounds for rehearing and reverse the conviction on those grounds.

running towards them. After Risner came around the corner of a building, Linda (sic) Havard approached from an alley running between two buildings. At this point, the testimony begins to conflict.

According to Risner's testimony, she saw appellant step from behind a building, raise a .22 caliber rifle to his shoulder, and point it at the police officer. She said that she shouted 'There he is,' and pointed in appellant's direction. Officer Williams then turned to appellant and shouted 'Freeze; stop; police; drop you weapon.' She said that she saw a flash from the muzzle of appellant's rifle and heard a shot. Risner counted six shots, all fired by appellant, but was not able to say precisely where the shots were aimed. On cross-examination, she was able to add few details.

Hall's and Huber's testimony was substantially the same as Risner's. The only direct conflict was that both security guards agreed that Risner did not shout 'There he is' and that Officer Williams did order appellant to freeze and drop his weapon, but did not announce that he was a police officer. In addition, Hall said that after the shots were fired, appellant went back around the building beside which he had been standing. Hall drew his pistol and followed appellant. He saw appellant start to get into a pickup truck. Hall shouted for appellant to freeze and drop his weapon, and appellant complied.

\* \* \* \* \* \*

. Appellant's testimony agreed with that of Huber and Hall, with certain additions. Appellant testified to his agitated mental state at the time of the offense; that he believed that he saw a flash from Williams' gun, that he believed was fired at him; and that he did not know that Williams was a police officer. Neutron activation tests and the testimony of Risner, Hall, and Huber indicate that appellant was the only one to fire a gun.

In grounds for rehearing one through three, appellant challenges this Court's holding as to his ninth point of error on direct appeal wherein appellant asserted the trial court erred in overruling his objection to the jury charge at the guilt/innocence phase of trial. Appellant objected to the failure of the charge to instruct the jury on the lesser included offense of voluntary manslaughter. V.T.C.A. Penal Code § 19.04. In addressing the ninth point of error, we held the trial court did not err in failing to instruct the jury on voluntary manslaughter because the issue was not raised by the evidence. In reaching this conclusion, the Court stated that provocation, in support of a claim of "sudden passion" under Penal Code § 19.04, must derive from the deceased and that therefore "the only evidence relevant to appellant's claim of voluntary manslaughter is his testimony that he believed that he had been fired at by [the deceased]." *Havard*, 800 S.W.2d at 206. This Court found the evidence did not show "appellant acted out of 'terror' and was incapable of reflecting on his action and acting with cool reflection[ ]", but rather it was appellant's conscious desire to fire at the deceased. *Id.* at 206.

In the three grounds for rehearing, appellant contends the Court erred in holding (1) the evidence did not raise the lesser included offense of voluntary manslaughter, and thus the trial court did not err in failing to submit a charge on the issue; (2) the only evidence relevant to whether voluntary manslaughter was raised was appellant's testimony that he believed the deceased had fired at him; and (3) that provocation in support of a voluntary manslaughter charge must derive from the deceased. The three grounds are obviously interrelated, but we address them independently in reverse order for clarity's sake.

Penal Code section 19.04 provides in pertinent part:

(a) A person commits [Voluntary Manslaughter] if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed *or another acting with the person killed* which passion arises at the time of the offense and is not solely the result of former provocation. (emphasis supplied)

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

Clearly, under the express language of this statute, provocation, in support of a claim of "sudden passion", may derive from someone other than the deceased, but this person must be someone *"acting with "* the deceased. *Marquez v. State,* 725 S.W.2d 217 (Tex.Cr.App.1987) (evidence must show anger was result of act of provocation on part of deceased or third party acting in concert with deceased). Thus, the Court erred in its original opinion when it stated provocation must derive from the deceased. In making that erroneous statement the Court relied upon two cases from this Court, *Hobson v. State,* 644 S.W.2d 473 (Tex.Cr.App.1983), and *Daniels v. State,* 645 S.W.2d 459 (Tex.Cr.App.1983).[2] In both *Hobson* and *Daniels,* the evidence showed a confrontation between only the defendant and the deceased, so whether provocation arose from someone other than the deceased was irrelevant to the disposition of those cases and was properly not addressed. Neither *Hobson* nor *Daniels* is dispositive of the case *sub judice.* Since provocation may arise from someone other than the person killed, pursuant to Penal Code § 19.04, we sustain appellant's third ground in his motion for rehearing.

■ Finding merit in appellant's third ground for rehearing leads us to find merit in his second ground as well. In his second ground for rehearing, appellant contends the Court erred in holding the only evidence relevant to whether voluntary manslaughter was raised was appellant's testimony that he believed the deceased had

fired at him. Appellant correctly asserts that this Court, in determining whether voluntary manslaughter was raised by the evidence, must consider not only the acts of the deceased but also the acts of anybody acting with the deceased. In his motion for rehearing, appellant argues that the security officers, Huber and Hall, were acting with the deceased, and therefore, in accordance with Penal Code § 19.04(b), the actions of the security officers as well as those of the deceased must be considered in determining whether the necessary provocation exists so as to raise voluntary manslaughter. Given the facts of this case, we agree with appellant that the security officers were acting in conjunction with the deceased and that evidence concerning their actions must be considered in determining whether the issue of voluntary manslaughter was raised. Thus, the Court erred on original submission in finding "the only evidence relevant to appellant's claim of voluntary manslaughter [was] his testimony that he believed that he had been fired at by [the deceased]." See *Havard,* 800 S.W.2d at 206. We therefore sustain appellant's second ground for rehearing.

■ With the resolution of the second and third grounds for rehearing, we are now in a position to address appellant's first ground for rehearing, which is actually a restatement of his ninth point of error on original submission, *viz:* the issue of voluntary manslaughter was raised and should have been submitted to the jury via the court's charge at guilt/innocence. This Court utilizes a two-prong test when determining whether the jury must be charged on a lesser included offense. This test, first followed by a plurality of this Court in *Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981) (Opinion on Rehearing), was adopted by a majority of the Court in *Aguilar v. State,* 682 S.W.2d 556 (Tex.Cr.App.1985). The test consists of the following: (1) the lesser included offense must be included within the proof necessary to establish the offense charged; and (2) there

---

**2.** The original opinion also cited two courts of appeals cases, *Belachheb v. State,* 699 S.W.2d 709 (Tex.App.—Fort Worth 1985, no pet.), and

*Jones v. State,* 687 S.W.2d 425 (Tex.App.—Dallas 1985, no pet.).

must be some evidence in the record that the defendant, if guilty, is guilty only of the lesser offense. See *Aguilar,* 682 S.W.2d at 558; *Moreno v. State,* 702 S.W.2d 636, 640 (Tex.Cr.App.1986); *Godsey v. State,* 719 S.W.2d 578 (Tex.Cr.App.1986); and *Dowden v. State,* 758 S.W.2d 264, 268 (Tex.Cr.App.1988).

Logic dictates that the first prong of this test is easily satisfied. At the risk of overstating the obvious, we note that in proving the charged offense, capital murder, the State must prove *inter alia* the defendant committed a murder. Murder is, by definition, a lesser included offense of capital murder because "it is established by proof of the same or less than all the facts required to establish the commission of [capital murder]". Art. 37.09(1), V.A.C.C.P. In *Bradley v. State,* 688 S.W.2d 847, 849 (Tex. Cr.App.1985), this Court held that in some circumstances voluntary manslaughter may be a lesser included offense to murder. If all other conditions are met, and if there is some evidence of sudden passion in the case, then voluntary manslaughter will be considered a lesser included offense of either murder or capital murder.[3] Concluding that voluntary manslaughter may be a lesser included offense of capital murder, we now must determine whether the evidence raised the issue that appellant was guilty only of voluntary manslaughter and was thus entitled to a corresponding jury charge.

In deciding whether the issue of a lesser included offense is raised, we look to all the evidence presented at trial and not solely whether the defendant's testimony raises or negates the issue of the lesser included offense. *Lugo v. State,* 667 S.W.2d 144, 147 (Tex.Cr.App.1984). The credibility of the evidence and whether it is controverted or conflicts with other evidence may not be considered. *Marras,* 741 S.W.2d at 405. It is the jury's duty, under proper instruction, to determine whether the evidence is credible and supports a finding that the lesser included offense was committed. *Hayes v. State,* 728 S.W.2d 804 (Tex.Cr.App.1987). The credibility of testimony is solely within the jury's domain, and it may "selectively believe" evidence at trial presented by the State and the defendant. See *Godsey,* 719 S.W.2d at 585 (Miller, J. concurring). In other words, the jury may accept or reject all or a part of a witness's testimony, including that of the defendant.

After reviewing the record, we find the evidence raises the issue of voluntary manslaughter. Appellant testified he went to his wife's apartment to get some information for their income tax forms. He and his wife, Elaine, began arguing when she refused to let him spend the night with her. Appellant stated he felt emotionally hurt and angry at this time, and both his and Risner's testimony established the argument was emotional and became physical.[4] According to appellant, Elaine "produced the rifle", which he took away from her, and then she ran from the apartment. Appellant, too, left the apartment, ran around the apartment building, and ended up on ledge[5] where the shooting occurred. He was looking for his wife, and when he found her, he raised the rifle and attempted

3. Also see *Lincecum v. State,* 736 S.W.2d 673, 679 (Tex.Cr.App.1987), where the Court assumes for the sake of argument that voluntary manslaughter is a lesser included offense of capital murder; *Harris v. State,* 784 S.W.2d 5, fn. 2 (Tex.Cr.App.1989); *Marras v. State,* 741 S.W.2d 395, 405 (Tex.Cr.App.1987) (same); and *Green v. State,* 682 S.W.2d 271, 295 (Tex.Cr.App.1984).

4. Appellant's wife, Elaine Havard, did not testify at trial, but Hall testified Elaine ran up to him and said, "Oh my God, help me. He's real mad." We include in this discussion the evidence regarding appellant's agitated emotional and mental state immediately prior to the shooting because such evidence is relevant to his state of mind at the time of the offense. V.T.C.A.

Penal Code § 19.06. See also *McCartney v. State,* 542 S.W.2d 156, 159 (Tex.Cr.App.1976) (former Presiding Judge Onion reviews the history of Penal Code § 19.04 and notes the time element of the sudden passion definition was not strictly limited by Texas courts to the actual time of the homicide but included provocation which "constitutes a part of the res gestae" of the homicide). The testimony is also relevant to the determination of whether appellant was incapable of cool reflection at the time of the shooting. Penal Code § 19.04(c).

5. From the exhibits, we find the "ledge" was a small grassy hill adjacent to the apartment building.

to look at his wife through the gun's scope, although he stated he does not know why he did that. Appellant heard "freeze", saw his wife be pushed to the ground by someone taller than she (Williams), and saw a gun pointed directly at him. He also stated he saw another person (Hall) standing with Williams and he thought he had a gun in his hands. Appellant did not know Williams was a police officer, nor did he hear Williams yell "police". After hearing "freeze", appellant testified he began to lower his rifle, but he saw the two men quickly coming toward him with guns, and then thought he saw a flash meaning someone was shooting at him. Appellant fired back, spraying the area with bullets, but he did not know he had hit anyone. He stated the whole incident, from the time he came around the corner to the shooting, lasted only about 10 seconds.

This case is clearly distinguishable from those cases wherein this Court has held that a mere claim of fear does not establish the existence of sudden passion arising from an adequate cause. See e.g. *Gonzales v. State*, 717 S.W.2d 355 (Tex.Cr.App. 1986). For a claim of fear to rise to the level of sudden passion, there must be evidence that the defendant's state of mind rendered him incapable of cool reflection. *Id.* at 357, citing *Daniels*, 645 S.W.2d 459. Testimony that the defendant became enraged, resentful or terrified immediately prior to the shooting adequately indicates such a state of mind. *Id.*, citing *Bradley*, 688 S.W.2d 847. In *Gonzales*, there was no testimony indicating the defendant was "emotionally aroused" at the time of the shooting or that he had cause to be aroused. On the contrary, the evidence showed appellant, after witnessing a confrontation between his friend and the victim in a bar, went to his friend's car, retrieved his pistol, waited for the victim, and then shot him after the victim came up behind him and fired a shot. This Court found the defendant's own testimony indicated he remained cool and composed throughout this confrontation. Thus, the defendant's "mental state did not call for an instruction on voluntary manslaughter." *Gonzales*, 717 S.W.2d at 357.

We find the present cause is more akin to *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr.App.1983). In that case, the defendant had an argument with a man she had dated. At the time of the argument, the defendant was described as "real mad", "mad", and "upset". The victim attempted to calm the defendant and eventually slammed the door in her face and locked her out of the victim's establishment, wherein was the boyfriend. The defendant kicked in the door and fired her revolver, killing the victim. At trial, the defendant testified the gun fired accidentally and that she was emotionally distraught immediately after the shooting. Considering all the relevant facts and circumstances in the case, the Court held the evidence was sufficient to warrant an instruction on voluntary manslaughter. *Id.* at 733.

Appellant's testimony in the case *sub judice* indicates he was emotionally hurt and mad at the time he raised his rifle while standing on the ledge. Appellant thought he saw two men with weapons drawn coming toward him and that someone actually shot at him. He testified the events of the shooting happened quickly and he did not know what he was thinking at the time. Appellant expressed fear for his life. Under these circumstances, the evidence indicates appellant was acting under the immediate influence of sudden passion arising from an adequate cause. Penal Code § 19.04(a). If the jury chose to believe appellant's testimony, then appellant is guilty only of voluntary manslaughter. Therefore, we hold the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter. Appellant's third ground in his motion for rehearing is granted, and we withdraw that portion of our original opinion addressing appellant's ninth point of error.

Accordingly, the judgment of the trial court is reversed and the cause is remanded.

DAVIS, J., not participating.

WHITE and STURNS, JJ., concur in the result.

BERCHELMANN, J., dissents.