In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-294 CR


____________________



MARCUS POLLARD, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 258th District Court


San Jacinto County, Texas


Trial Cause No. 9222






 MEMORANDUM OPINION 


 Marcus Pollard appeals his murder conviction. See Tex. Pen. Code Ann. § 19.02
(Vernon 2003). Pollard raises three issues on appeal. In issue one, Pollard asserts that
during voir dire the trial court gave the jury an improper suggestion as an example when a
jury could consider probation. In issue two, Pollard contends that the trial court erroneously
admitted the medical examiner's opinion testimony addressing the distance between the
victim and the gun used to kill the victim when it was fired. In issue three, Pollard argues
that the trial court should have granted his request for mistrial because the State withheld
exculpatory evidence. We overrule Pollard's three issues and affirm the judgment of the trial
court.

Background

 During the early morning hours of June 16, 2005, Pollard called his uncle, who was
staying with Pollard's mother, seeking help. Pollard's uncle went to Pollard's house and saw
Megan Pollard, Pollard's wife, lying under the carport. After determining that Megan was
dead, Pollard's uncle suggested that Pollard contact law enforcement. Pollard refused and
instead placed his two small children in his uncle's truck. Pollard's uncle took the children
to Pollard's mother's home and then contacted the sheriff's department. Later, Pollard went
to his mother's house and said that he wanted to say good-bye to his children. He told his
uncle that he was going to drive for a few days and then commit suicide. Then Pollard left. 
Pollard's uncle contacted the sheriff's department again and reported that Pollard had just
left the house. 

 The police arrested Pollard on Highway 59. After obtaining consent for a search of
Pollard's home, the police recovered a shotgun from under the couch. Dr. Tommy Brown
performed an autopsy on Megan and determined that she died of a shotgun wound to her
head. The State indicted Pollard for the murder of his wife, Megan. At trial, the State
asserted that Pollard shot Megan on the front porch of the house and then moved her body
to the carport. Pollard contended that while he and Megan argued, they struggled over the
gun and it discharged as Megan grabbed the barrel. After hearing the evidence, the jury
convicted Pollard of murder and assessed his punishment at fifty years' confinement. Pollard
timely filed his notice of appeal. 

Challenge to Voir Dire Questions

 In his first issue, Pollard contends the trial court improperly committed the jury to a 
factual scenario concerning the circumstances under which it would consider probation. 
Specifically, Pollard asserts that the example provided by the judge tended to bias or
influence the jury not to consider probation under Pollard's circumstances. 

 Commitment questions require a venire panel member to promise that he will base his
verdict or course of action on some specific set of facts before he has heard any evidence. 
Sanchez v. State, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). Not all commitment
questions are improper: "questions concerning a juror's ability to consider the full range of
punishment for a particular offense [are] commitment questions but are nevertheless proper." 
Standefer v. State, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001). Such proper commitment
questions may, however, become improper if they include "facts in addition to those
necessary to establish a challenge for cause" when the question "attempts to create a bias or
prejudice in the venireman before he has heard the evidence[.]" Sanchez, 165 S.W.3d at 712.

 Pollard asserts that while his trial counsel sought to gain insight into the venire panel
members' attitudes toward probation in a murder case, the trial judge provided a fact specific
example of a "mercy killing" that directed the jury to think narrowly, thereby, denying
Pollard of a fair trial before an impartial jury. 

 However, the record reflects otherwise. After Pollard's counsel attempted to
individually voir dire several veniremen regarding the full range of punishment, the trial
judge stated that she was going to provide examples to the venire panel in open court. The
following then transpired:

 [Defense Counsel] I think it's more appropriate to do individual voir dire. You
know, I think it has to be up to the jurors to be able to come up
with their own situations. They consider it for us to supply
reasons. The question is pretty straight forward. Can they
conceive of any cases? If they can't, then they can't truly
consider the punishment range.


 THE COURT: Okay. Objection overruled.


 (Open court, defendant and counsel present)


 THE COURT: These are the remaining individuals that remained seated in
here.


 For those of you and particularly who raised your hands
pertaining to the punishment range, the punishment as well as
probation, one of the attorneys had asked if you could think of
any specific instances where probation might be warranted in a
[murder case].


 The Court's going to give you two examples of cases and I want
y'all to consider this before we continue this individual voir
dire.


 I had a case over in Polk County where a boyfriend/girlfriend,
the girlfriend was charged with murder for killing her boyfriend. 
The jury found her guilty and came back with a verdict of
probation in that case.


 Another case that most recently happened that some of y'all may
be familiar with is that a husband, an elderly husband, recently
shot and killed his terminally ill 78-year-old wife. She[] was in
pain and suffering. He shot and killed her.


 Now, he just recently died so that case never went to trial;
however, the jury where it was the boyfriend/girlfriend they
were much like you. They did not hear any of the evidence but
once they were sworn in as jurors, listened to the evidence,
found her guilty and they were able to consider and then did, in
fact, give her probation.


 The case with the terminally ill husband that could have been a
circumstance that warranted the jury considering giving him
probation. So those are two instances where a possible murder
indictment in the case I tried was a murder indictment, but the
jurors came back with a verdict of probation.


 Now, with that in mind those of you who are having problems
considering probation, do you now understand that for right now
we're not asking you to commit to doing anything. We're just
asking if you can consider. After you've heard the testimony
and if the jury finds the defendant guilty, if and only if, can you
consider the full range of punishment that our state legislature
has given us which can include community supervision or
probation?


 Now, at this time what I want to do is ask you to raise your card
if after those two examples and that explanation you're still not
comfortable or confident telling this Court that you could
consider probation, then I just need you to please raise your card
again at this time. 


 The trial judge did not request the veniremen to make any commitment based on the
facts in these scenarios as they pertained to Pollard's case. The judge did not attempt to bind
a venire panel member to resolve or refrain from resolving an issue on the basis of one or
more facts contained in her examples. See Halprin v. State, 170 S.W.3d 111, 118-19 (Tex.
Crim. App. 2005) (citing Standefer, 59 S.W.3d at 180) (prosecutor's example of a mercy
killing was not improper because it did not attempt to bind potential jurors to a minimum
punishment for an intentional murder). After giving examples to show that situations could
vary, the judge asked whether the venire panel members could consider probation after
hearing the testimony and only if they were to determine that the defendant was guilty. The
judge's example did not suggest that it was the only factual scenario when probation would
be proper. Rather, it concerned the juror's ability to consider the full range of a potential
sentence. Therefore, the question was not improper. See Standefer, 59 S.W.3d at 181. 
Because the example did not attempt to improperly limit the jury's consideration of the
potential sentence range under the facts of Pollard's case, it was not improper. We overrule
Pollard's first issue. 


Reliability of Dr. Brown's Distance Testimony 

 In issue two, Pollard argues that the trial court erred in admitting Dr. Tommy Brown's
testimony addressing the distance between the gun and the victim when the gun discharged. 
Pollard contends that Dr. Brown's testimony was based on scientific testing that Dr. Brown
failed to properly apply. 

 We review the trial court's admission of expert testimony for an abuse of discretion. 
Brito Carrasco v. State, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); Kelly v. State, 824
S.W.2d 568, 574 (Tex. Crim. App. 1992). The Court of Criminal Appeals held in Kelly that 
reliable evidence derived from a scientific theory must satisfy three criteria: (a) the
underlying theory must be valid; (b) the technique applying the theory must be valid; and (c)
the technique must have been properly applied. Kelly, 824 S.W.2d at 573. Factors affecting
the trial court's proper determination of these criteria include, but are not limited to, (1) the
extent to which the underlying scientific theory and technique are accepted as valid by the
relevant scientific community, if such community can be ascertained; (2) the qualifications
of any expert testifying; (3) the existence of literature supporting or rejecting the underlying
scientific theory and technique; (4) the potential rate of error of the technique; (5) the
availability of other experts to test and to evaluate the technique; (6) the clarity with which
the underlying scientific theory and technique can be explained to the court; and (7) the
experience and skill of any person who applied the technique on the occasion in question. 
Id. However, the "party seeking to introduce evidence of a scientific principle need not
always present expert testimony, treatises, or other scientific material to satisfy the Kelly
test." Hernandez v. State, 116 S.W.3d 26, 28-29 (Tex. Crim. App. 2003). 

 The State called Dr. Brown, the medical examiner who performed the autopsy on
Megan, as a witness during its case. Pollard asserts that the trial court erred in permitting Dr.
Brown to testify regarding the distance from which Pollard fired the shotgun at Megan.
Specifically, Pollard contends that the State failed to meet its burden of proving by clear and
convincing evidence that Dr. Brown's opinion met the three-prong Kelly criteria. Pollard's
argument focuses on Kelly's third prong, and he asserts that Dr. Brown failed to correctly
apply the technique to determine the distance between the gun at discharge and the victim. 

 The record contains testimony addressing Dr. Brown's qualifications pertinent to his
opinion regarding the discharge distance at issue. Dr. Brown is board certified in anatomic
clinical pathology, nuclear medicine, and forensic pathology, and has a Texas medical
license. As a pathologist, he conducts autopsies to determine the cause and manner of death,
but focuses on unnatural deaths. Dr. Brown testified that he has performed around 10,000
autopsies, including more than a hundred that involved shotgun wounds. In determining the
cause of death, Dr. Brown explained that he evaluates the body and the wound, and in some
cases is able to approximate the distance between the muzzle and the decedent. 

 Dr. Brown testified that his training included attending gunshot wound courses and
receiving instruction from Dr. Dimaio, a nationally recognized expert in evaluating gunshot
wounds. Based on this training, Dr. Brown explained that he looked for specific wound
characteristics to estimate the approximate discharge distance. During the Kelly hearing and
in the presence of the jury, Dr. Brown testified in detail regarding variations in the
appearance of a shotgun wound as it related to the discharge distance of the weapon. Based
upon the autopsy of Megan and his training, Dr. Brown estimated that the end of the shotgun
was three to four feet from Megan when the gun discharged. Dr. Brown explained that his
discharge estimate was based on certain characteristics of the wound that were consistent
with a relatively close discharge. 

 Additionally, Dr. Brown testified that a more precise or accurate measurement could
be obtained by further testing. To do so, Dr. Brown explained that the actual firearm
involved in a shooting could be test-fired against cardboard at various distances using the
same or a similar box of ammunition as used in the event. The results from the discharge of
the weapon onto the cardboard are then compared with the measurements of the victim's
wound to establish a discharge distance. 

 In this case, Dr. Brown stated that he did not test-fire the weapon. In explaining the
estimate he provided, Dr. Brown clearly explained that his discharge distance was an
estimated distance. Throughout his testimony, Dr. Brown explained the bases of his findings
and the methodology that he applied to estimate the distance between Megan and the shotgun
when it discharged.

 Pollard argued that Dr. Brown testified as a ballistics expert and did not properly
apply the technique of the theory he relied upon to determine the distance from which the
shotgun was fired. The record, however, shows that Dr. Brown's testimony was based upon
his expertise as a medical examiner and his examination and evaluation of the characteristics
of Megan's wound. Moreover, Dr. Brown identified his discharge distance as an estimate
and explained how that distance could more accurately be determined. Pollard did not
produce a ballistics expert to provide a discharge distance that contradicted Dr. Brown's
estimate and fails to demonstrate on appeal how the degree of imprecision in Dr. Brown's
estimate renders it unreliable. See Morris v. State, 214 S.W.3d 159, 174 (Tex.
App.-Beaumont 2007, pet. filed). We conclude that the trial court did not err in admitting
Dr. Brown's discharge estimate. We overrule Pollard's second issue.

Mistrial Request Based on Alleged Brady Violation

 In his third issue, Pollard contends that the trial court erred by denying his request for
a mistrial after a police officer testified about a statement made by Pollard to the police. 
Specifically, Pollard argues that the State failed to disclose that he made an oral statement
about his moving Megan from the porch to the carport to assist her in getting medical help. 


 The State has an affirmative duty to turn over material favorable evidence to the
defense. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Harm
v. State, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). This duty arises when the
information is known to the State, "'but unknown to the defense.'" See Hayes v. State, 85
S.W.3d 809, 814-15 (Tex. Crim. App. 2002) (quoting United States v. Agurs, 427 U.S. 97,
103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Relying on a previous holding, the Texas Court
of Criminal Appeals stated that "the Brady rule did not apply when the appellant was already
aware of the information." Id. at 815 (citing Havard v. State, 800 S.W.2d 195, 204 (Tex.
Crim. App. 1989)). 

 Like Hayes and Havard, Pollard "'knew of the fact that he made a statement to the
police and the content of that statement . . . [Pollard] knew of both the existence and the
content of the statement, as a matter of simple logic, because he was there when he made it.'"
Id. (quoting Havard, 800 S.W.2d at 204). The evidence about which Pollard complains, his
own statement, does not fall within the Brady rule. We overrule Pollard's third issue and
affirm the trial court's judgment.

 AFFIRMED.

 ____________________________

 HOLLIS HORTON

 Justice

Submitted on May 10, 2007

Opinion Delivered September 5, 2007

Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.