# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-11-00224-CR

Mario Albert Valadez, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
NO. CR2010-417, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Mario Albert Valadez of the offense of burglary of a habitation. *See* Tex. Penal Code Ann. § 30.02 (West 2011). Punishment, enhanced by eight prior felony convictions, was assessed at life imprisonment. In two points of error, Valadez asserts that the district court abused its discretion in excluding hearsay testimony and that the district court erred in denying his request for an instruction on the lesser-included offense of theft. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that on June 11, 2010, the home of Tony and Leticia Valadez was burglarized.[1] Their adult son, Tony Jr., was alone in the house when the burglary allegedly

---

[1] Several witnesses in the case are related to Valadez and share his surname. To avoid confusion, we will refer to these witnesses using their first names.

occurred, and he was the State's primary witness during trial. Tony Jr. testified that he was asleep in the house that morning when he heard the doorbell ring. Tony Jr. remained in bed. However, "about three to five minutes" later, when he got up to use the bathroom, he heard someone in his parents' bedroom, walked slowly to their room, and looked in the doorway. Inside the bedroom, Tony Jr. saw Valadez, his uncle and Tony's brother, looking through the closet. Tony Jr. testified that Valadez "had a ring and a watch and other stuff in his hand." According to Tony Jr., Valadez saw him, attempted to explain to Tony Jr. that he was a drug addict and needed "help," and asked him if he was going to tell his parents what he had seen. Tony Jr. told Valadez that if he "put everything back," he would not tell his parents. Valadez then proceeded to "put some stuff back," continued asking Tony Jr. not to say "anything . . . to anyone," and eventually left the house.

Tony Jr. further recounted that while he was out eating dinner with his friends that night, he received a phone call from his father, who inquired if any of his friends had been inside the house. Tony Jr. denied that anyone had been inside. When Tony Jr. returned to the house later that night, police officers were there. When Tony Jr. asked his father what had happened, his father told him that his wedding band and his watch were missing. After the police left, Tony Jr. told his father that Valadez had been inside the house. His father then called the police, officers returned to the house, and they took a statement from Tony Jr. Tony Jr. also testified that he did not let his uncle into the house that day, that he did not give his uncle consent to come into the house, and that he did not give him permission to take the watch or the wedding band.

On cross-examination, Tony Jr. acknowledged that he did not know how Valadez had entered the house and that he had observed no signs of forced entry. The record reflects that the

house has three exterior doors—the front door, a side door into the kitchen, and a back door entering into the master bedroom. Tony Jr. acknowledged that his parents usually lock the three exterior doors into the house when they leave, but he did not know whether the doors were locked that day. Additionally, Tony Jr. admitted that when he had been interviewed by police, he had told them that the incident had occurred at approximately 2:00 p.m., and that the trial was the first time he had claimed the incident had occurred in the morning.

Tony Sr. testified that on the day of the alleged burglary, he had left his house at approximately 7:45 a.m. and returned at approximately 3:00 p.m. or 4:00 p.m. that afternoon. When he returned, he noticed that the back door to the master bedroom, which he testified had not been used in seven to eight years,[2] was open and that a small John Deere tractor inside the bedroom that had always been "backed up to that door" had been "pushed forward . . . three feet from the door."[3] Tony shut the door, "went on with [his] business," and left the house. When Tony returned to the house later that afternoon, he noticed that his wedding band and his watch, both of which he usually kept on his nightstand, were missing. Tony also observed that various pieces of jewelry belonging to his wife were on his nightstand instead of hers, which he found to be "out of the ordinary." Tony asked his wife why her jewelry was on his nightstand, and she did not know. At that point, Tony called the police. When the police arrived, Tony also noticed a "fresh footprint" near the back door and pointed it out to the officers. The officers took photographs of the bedroom, the door, and the

---

[2] However, on cross-examination, Tony admitted that he had reported to the police that the door "opens from time to time when the house settles."

[3] The record is unclear as to the exact size of the tractor. However, in response to a question as to how big the tractor was, Tony Jr. suggested that it was a toy, testifying that it was "not too big" and was "for a child" or "for a kid."

footprint, and copies of the photographs were admitted into evidence. Tony testified that he did not allow his brother inside his house that day, that he did not give him consent to enter the house, and that he did not give him permission to take his belongings.

Tony's wife, Leticia, testified that after her husband had told her that his watch and wedding band were missing, she began to look around their bedroom and noticed that some items were out of place and that her dresser drawers and jewelry boxes had been opened and "seemed like they had been gone through." Leticia then recounted how she and her husband had reported the incident to the police and had obtained information from their son about who had been inside the house. Leticia further testified that the following morning, she had gone to a pawn shop to look for the missing items.[4] There, Leticia learned that the items had in fact been pawned at the store's other location.[5] Leticia and Tony went to that location and recovered their property. Leticia also testified that she did not allow Valadez to come into her house on the day in question, that she did not give him consent to come into her home that day, and that she did not give him permission to take her husband's watch or wedding band.

One of the witnesses for the defense was Detective Edward Wahrmund of the New Braunfels Police Department, who had investigated the case. Defense counsel first attempted to elicit testimony from Wahrmund regarding statements allegedly made by Valadez during his interview with police. In these statements, which we explain more fully below, Valadez admits to

---

[4] On cross-examination, Leticia testified that she had called Valadez the previous night and that he had told her where he had taken the items.

[5] Carolina Cheatham, an employee of the pawn shop at the time, testified that she had bought the items in question and identified Valadez as the man who had sold them to her.

4

participating in a drug transaction with Tony Jr. and claims that the stolen items were given to him by Tony Jr. in exchange for marihuana. The State objected to this testimony as inadmissible hearsay, while the defense argued that the testimony was admissible as a statement against interest. Following a hearing outside the presence of the jury, the district court sustained the State's objection.

When the jury returned, defense counsel proceeded to question Wahrmund on other matters related to the investigation. Wahrmund testified that footprints were found leading into but not out of the house through the master bedroom. From this evidence, Wahrmund surmised that the burglar got out of the house "probably through another entrance or exit." Wahrmund also testified that during the investigation, he "did not note any signs of forced entry" into the house.

Officer Michael Smith of the New Braunfels Police Department also investigated the burglary and testified for the defense. Smith testified that he had concluded during the investigation that the person who had committed the burglary must have been someone who was familiar with the house.[6] He came to this conclusion because "whoever came in was very meticulous as to where they looked. They pulled out items, set them aside, and did not take all of the valuables they saw; only specific items." Smith also testified that there were no signs of forced entry into the house.

During the charge conference, the defense requested a jury instruction on the lesser-included offense of theft, which the district court denied. Following its deliberations, the jury found Valadez guilty as charged and subsequently assessed punishment at life imprisonment. The district court sentenced Valadez in accordance with the jury's verdict. This appeal followed.

---

[6] One of the defense's theories during trial was that Valadez had not visited the house often and thus was unfamiliar with where valuable items were kept in the house.

## ANALYSIS

**Hearsay**

In his first point of error, Valadez asserts that the district court abused its discretion in excluding his statements to police regarding the alleged drug transaction between himself and Tony Jr. According to Valadez, the statements were against his interest and were thus admissible under an exception to the hearsay rule. *See* Tex. R. Evid. 803(24). The State responds that the exception does not apply in this case because the statements Valadez allegedly made were not against his interest but were instead self-serving.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

Hearsay is a statement, other than one made by the declarant testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is inadmissible unless it fits into an exception provided by a statute or the rules of evidence. Tex. R. Evid. 802. One such exception provided by the rules of evidence is a "statement against interest," defined as,

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or

to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true.

Tex. R. Evid. 803(24). Moreover, "[i]n criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* Additionally, it has long been the rule in Texas that if the statement is made by the defendant, but the statement is self-serving, i.e., it tends to absolve the defendant of responsibility for the crime charged, the statement is inadmissible. *See Wood v. State*, 18 S.W.3d 642, 651 (Tex. Crim. App. 2000); *Hafdahl v. State*, 805 S.W.2d 396, 402 (Tex. Crim. App. 1990); *Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. 1981); *Hernandez v. State*, 171 S.W.3d 347, 356 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *Davis v. State*, 970 S.W.2d 758, 760-61 (Tex. App.—Austin 1998, pet. ref'd); *see also Langford v. State*, No. 03-08-00456-CR, 2010 Tex. App. LEXIS 567, at *12-13 (Tex. App.—Austin Jan. 27, 2010, no pet.) (mem. op., not designated for publication) (explaining that statements by defendant are to be excluded when "[t]he inculpatory significance of the statements [is] minor in comparison to its significance as means of absolving [the defendant] of the crime for which he was accused").

During his offer of proof, Valadez elicited the following testimony from Wahrmund:

Q.	Did you investigate the case of the burglary of a habitation of Mario Valadez?

A.	I did.

Q.	Okay. And during that time did you question Mario about the case?

A.	I did have an occasion to meet with him and speak with him.

7

Q. Okay. Did you ask him his side of the story?

A. I did.

Q. Did he give you an explanation?

A. He explained that he had met with his nephew, who I called Tony Junior in my report, and a transaction was made between them.

. . . .

Q. What did that mean to you?

A. After explaining that he had pawned the jewelry and explaining—or I asked what happened or how that came about. He explained that he had made a transaction with Tony Junior. I followed up with questions to clarify what kind of transaction he was referring to.

Q. How did you clarify?

A. I asked him in just lay terms, street terms, I asked him if he was talking about a white transaction or a green transaction.

Q. What does that mean?

A. I was referring to white being methamphetamine or heroin, or green being marihuana.

Q. And how did he respond to you?

A. He admitted—or he told me that it was a green transaction.

Q. So he admitted to a green transaction, which would be selling marihuana?

A. Correct.

Q. Okay. And he admitted that he sold that marihuana to Tony Junior. Is that correct?

A. That's correct.

Q. And he said that that was at Tony Junior's request?

8

A.    Yes.

Q.    And did he say that Tony then gave him the items to pawn for payment?

A.    It was my understanding that he received those items as payment for the marihuana.

The district court would not have abused its discretion in finding that although the above statements tended to subject Valadez to prosecution for a marihuana transaction, the statements also tended to absolve him of the burglary offense for which he was charged. Valadez had told Wahrmund that the stolen items were given to him by Tony Jr. as payment for marihuana. In other words, Valadez was claiming that rather than being the perpetrator of a burglary of his brother's home, he was merely at the house selling marihuana to his consenting, adult nephew. While selling marihuana is certainly a criminal offense, it would not be outside the zone of reasonable disagreement for the district court to conclude that the inculpatory significance of admitting to a drug offense was minor in comparison to its significance as a means of absolving Valadez of the burglary offense for which he was charged. Accordingly, we cannot conclude that the district court abused its discretion in finding Valadez's statements to be more self-serving than inculpatory and thus inadmissible. *See Wood*, 18 S.W.3d at 651; *Hernandez*, 171 S.W.3d at 356; *Davis*, 970 S.W.2d at 761.

We overrule Valadez's first point of error.

**Lesser-included offense**

In his second point of error, Valadez asserts that the district court erred in denying his requested instruction for the lesser-included offense of theft. The State responds that Valadez

9

was not entitled to such an instruction because there was no evidence presented that Valadez, if guilty, was guilty only of the offense of theft.

An offense is a lesser included offense if it is established by proof of the same or less than all the facts required to establish the commission of the offense charged. Tex. Code Crim. Proc. Ann. art. 37.09(1) (West 2006). The determination of whether a lesser-included-offense instruction requested by a defendant must be given requires a two-step analysis. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011) (citing *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007)). The first step of the analysis asks whether the lesser-included offense is included within the proof necessary to establish the offense charged. *Id.* The second step is to determine if there is some evidence in the record which would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* at 145.

The State does not dispute that theft is included within the proof necessary to establish the charged offense. Assuming without deciding that the first prong of the test was satisfied in this case, Valadez would be entitled to an instruction on that offense only "if there is some evidence in the record which would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Id.* at 145 (citing *Guzman v. State*, 188 S.W.3d 185, 188-89 (Tex. Crim. App. 2006); *Hall*, 225 S.W.3d at 536). "In this step of the analysis, anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge." *Hall*, 225 S.W.3d at 536. "In other words, the evidence must establish the lesser-included offense as 'a valid, rational alternative to the charged offense.'" *Id.* (quoting *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)).

In deciding whether the issue of a lesser-included offense is raised, we look to all the evidence presented at trial. *Havard v. State*, 800 S.W.2d 195, 216 (Tex. Crim. App. 1989). The credibility of the evidence and whether it is controverted or conflicts with other evidence may not be considered. *Id*. It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). Rather, there must be some evidence directly germane to a lesser-included offense for the fact-finder to consider before the instruction is warranted. *Id*. A lesser-included offense may be raised if evidence either affirmatively refutes or negates an element establishing the greater offense, or the evidence on the issue is subject to two different interpretations, and one of the interpretations negates or rebuts an element of the greater. *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996).

In this case, the question is whether there was some evidence presented at trial that would have permitted a rational jury to acquit Valadez of burglary of a habitation and find him guilty only of theft. As charged, a person commits the offense of burglary of a habitation if he enters a habitation without the effective consent of the owner with the intent to commit a theft or if he commits or attempts to commit a theft. *See* Tex. Penal Code Ann. § 30.02(a)(1), (3). Therefore, in order to acquit Valadez of burglary but find him guilty only of theft, there must be evidence in the record that Valadez either did not enter the home at all or, if he did, that he did so *with* the owners' effective consent.

No such evidence was presented at trial. Tony Jr. testified that he found Valadez inside the home, and this testimony was undisputed. As for the issue of consent, the owners of the home, Tony and Leticia, both testified that they did not allow Valadez into their home that day or

11

give him consent to enter the house. Their son, Tony Jr., similarly testified.[7] The evidence showing Valadez's lack of consent to enter the house was also undisputed.

Valadez's primary argument for why he was entitled to an instruction of the lesser-included offense of theft is that there were "credibility" issues with the State's witnesses, particularly Tony Jr. claiming for the first time during trial that the burglary occurred in the morning rather than in the afternoon. Again, however, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted." *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). No such evidence was presented in this case. *See also Robinson v. State*, No. 07-08-00157-CR, 2010 Tex. App. LEXIS 2446, at *8-9 (Tex. App.—Amarillo Apr. 6, 2010, pet. ref'd) (mem. op., not designated for publication) (explaining that more is required to entitle defendant to instruction on lesser-included offense of theft than "simply . . . pointing out reasons the jury could have disbelieved the State's evidence [that the defendant] committed the burglary").

Valadez also argues that evidence showing that there were no signs of forced entry into the home supports a lesser-included-offense instruction. However, the lack of forced entry does not negate any element of burglary as that offense is currently defined. *See Clark v. State*, 667 S.W.2d 906, 908 (Tex. App.—Dallas 1984, pet. ref'd); *see also* Tex. Penal Code Ann.

---

[7] We also note that even if the district court had admitted Valadez's statements tending to show that Tony Jr. had allowed Valadez to enter the home for the purpose of engaging in a drug transaction, the statements would not be evidence that Tony Jr. was legally authorized to give consent to enter the home on behalf of his parents. *See Gonzales v. State*, 931 S.W.2d 574, 575-76 (Tex. Crim. App. 1996).

12

§ 30.02(b) (defining "enter" for purposes of burglary statute; definition does not include use of force); *Griffin v. State*, 815 S.W.2d 576, 578 (Tex. Crim. App. 1991) ("Section 30.02 abolished the distinction between daytime and nighttime burglary and abolished any requirement for a 'breaking,' requiring only an entry with the requisite intent."). Moreover, there was evidence of forced entry in this case. The evidence showed that Valadez may have entered the house by pushing open the back door into the master bedroom and displacing the small tractor that had been placed against the inside of the door. But even if no force was required to enter the home and the doors had been unlocked prior to Valadez's entry, there was no evidence presented that Valadez had the owners' effective consent to enter the home. *See Clark*, 667 S.W.2d at 908 ("[A]n entry through an open door can constitute a burglary . . . if the building is not open to the public."); *see also Rogers v. State*, No. B14-91-00041-CR, 1992 Tex. App. LEXIS 2215, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 13, 1992, no pet.) (not designated for publication) ("That the complainant left his door unlocked is not material, since entry through an open door constitutes burglary, if done without the effective consent of the owner.").

Finally, Valadez asserts that a lesser-included-offense instruction was warranted because he was "looking at a life sentence" if convicted of the offense of burglary of a habitation.[8] *See Grey v. State*, 298 S.W.3d 644, 647 (Tex. Crim. App. 2009) (case involving request by State for lesser-included offense instruction; discussing Supreme Court precedent concluding that "a failure in a capital case to submit a lesser-included offense when raised by the evidence violates the

---

[8] We note that Valadez was "looking at a life sentence" because of his status as a habitual offender, not because of the burglary offense itself, which is classified as a felony of the second degree. *See* Tex. Penal Code Ann. § 30.02(c)(2) (West 2011).

constitution because there is an unwarranted risk that 'a jury might convict a defendant of a capital offense because it found that the defendant was guilty of a serious [but lesser] crime.'") (quoting *Hopper v. Evans*, 456 U.S. 605, 610 (1982)). However, in this case, for the reasons explained above, the lesser-included offense of theft was not raised by the evidence as a valid, rational alternative to the burglary offense charged. Accordingly, the constitutional concerns identified in *Grey* are not implicated here, and we cannot conclude that the district court erred in refusing to instruct the jury on the lesser-included offense of theft.

We overrule Valadez's second point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   October 26, 2011

Do Not Publish

14